**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

GENERAL DIRECT MARKETING, INC., :    No. 3:05cv140
SHAWNEE RESORTS OF SOUTH    :
CAROLINA, INC., SHAWNEE    :    (Judge Munley)
DEVELOPMENT, INC.,    :
           **Plaintiffs**    :
      v.    :
                         :
LEXINGTON INSURANCE CO.,    :
           **Defendant**    :

## MEMORANDUM

Presently before the Court for disposition is Defendant Lexington Insurance Company's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The parties have fully briefed this matter, and it is ripe for disposition. For the following reasons, we will deny the motion.

### I.    Background[1]

The plaintiffs, General Direct Marketing, Inc., Shawnee Resorts of South Carolina, Inc., and Shawnee Development, Inc., (collectively "Plaintiffs") purchased a Commercial General Liability Contract (the "policy") on April 1, 1999, from Lexington. Each individual plaintiff is an insured under the policy. The policy contains three relevant coverage periods: 1) Coverage A for bodily injury; 2) Coverage B for personal and advertising injury; and 3) a Hotel Professional Liability Endorsement (the "endorsement"). The endorsement provides:

The Company will pay on behalf of the Insured all sums which the Insured

---

[1] The background facts are derived from the complaint and the attached exhibits.

shall become legally obligated to pay because of:

Injury arising out of the rendering of or failure to render, during the policy period, professional services by the Insured, or by any person for whose acts or omissions such Insured is legally responsible.

Exclusion

1.    This insurance shall not apply to any acts and omissions, malpractice, or mistake of a professional nature committed or alleged to have been committed by or on behalf of the Insured other than in the conduct of the business activities as hotel proprietor.

2.    This insurance does not apply to liability to the Insured as a proprietor, superintendent or executive officer of any hospital, sanitarium, clinic with bed and board facilities, laboratory or business enterprise.

(Compl. Ex. F).

Finally, the policy contains a "Discrimination and Wrongful Termination Exclusion."

It is understood and agreed that this policy shall not apply to any alleged or actual discrimination against a past, present, or prospective employee nor to discrimination committed intentionally against any other person.  It is further agreed that this policy shall not apply to any liability arising out of any alleged or actual wrongful termination.

(Def. Ex. B3 in Supp. Mot. to Dismiss).[2]

On May 20, 2003, Plaintiffs were sued by the National Association for the

Advancement of Colored People ("NAACP") in the United States District Court for the

District of South Carolina in NAACP et al., v. Shawnee Development, Inc., General Direct

Marketing, Inc. d/b/a The Yachtsman Resort Hotel, David Walker, Shawnee Resorts of South

Carolina, Inc. and John Does 1-10, 03cv1733 (May 20, 2003) (the "NAACP complaint").

---

[2] Although this provision of the policy is not appended to or included in the Complaint, we consider it at this stage of the litigation as an "indisputably authentic document" on which the Plaintiffs' claim is based.  Sentinel Trust Co. v. Universal Bonding Ins. Co., 316 F.2d 213, 216 (3d Cir. 2003).

Therein, the NAACP and twelve of its members alleged that the Yachtsman Resort Hotel

instituted discriminatory policies and procedures during the Memorial Day weekend event

known as "Black Bike Week."  The NAACP averred that General Direct owned and operated

the Yachtsman, Shawnee Development was the sole owner of General Direct, and thus

Shawnee exercised control over the rates, policies, rules, terms, and conditions of the

Yachtsman.

Black Bike Week occurs every Memorial Day weekend and is sponsored by the town

of Atlantic Beach, South Carolina, a largely African-American town bordered on three sides

by North Myrtle Beach, a predominately Caucasian town.  Approximately 100,000

motorcycle enthusiasts attend Black Bike Week every year, and many of the participants stay

at hotels on or near Ocean Boulevard in nearby Myrtle Beach and patronize the

establishments there.

A similar, predominately Caucasian, motorcycle gathering occurs on a different

weekend every year, and is known as the Harley Rally or Harley Week.  Harley Week draws

approximately 200,000 persons, and it has caused significant public disturbances, including

fights between biker gangs such as the Pagans and Hell's Angels.

During Black Bike Week, the Yachtsman adopts "explicitly disparate practices and

policies that are intended to discriminate against and have the effect of discriminating against

Black Bike Week participants."  (Underlying Compl. ¶ 35).  These policies and practices are

in effect at no other time of the year, even Harley Week.  The disparate practices include

3

requiring guests to sign a 34 rule guest contract, the breach of which results in forfeiture of

all deposits and half the remaining balance due.  No such policy is in effect during any other

event.  The room rates are higher during Black Bike Week than at any other time.  Upon

making a reservation, Black Bike Week guests are required to pay all three nights plus a three

night deposit up front, whereas the Yachstman requires prepayment of solely the  first night

for Harley Week reservations.

      Based on the allegedly disparate policies, the NAACP advanced three causes of action

against the plaintiffs, based on violations of 42 U.S.C. § 1981, 42 U.S.C. § 2000a, and S.C.

CODE ANN. §§ 45-9-10, 45-9-30.  In response, Plaintiffs sent Lexington a letter on May 29,

2003 requesting that it defend the underlying suit.  On June 5, 2003, Lexington

acknowledged receipt of the letter, and on October 17, 2003, denied coverage under the

policy.  Plaintiffs obtained counsel at their own expense, and on October 18, 2004, settled the

NAACP suit for an amount in excess of $75,000.  On January 20, 2005, the plaintiffs filed

the instant suit seeking damages for breach of the policy and for bad faith pursuant to 42 PA.

CONS. STAT. ANN. § 8371.

## II.    Jurisdiction

      This Court has jurisdiction pursuant to the diversity jurisdiction statute, 28 U.S.C. §

1332.  Plaintiffs General Direct and Shawnee Development are a Pennsylvania corporations

with their principle places of business in Pennsylvania.  Plaintiff Shawnee Resorts South

Carolina is a South Carolina corporation with its principle place of business in South

Carolina.  Lexington is a Delaware corporation.  Because we are sitting in diversity, the

substantive law of Pennsylvania shall apply to the instant case.  Chamberlain v. Giampapa,

210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).

## III.    Standard

When a 12(b)(6) motion is filed, the sufficiency of a complaint's allegations are

tested.  The issue is whether the facts alleged in the complaint, if true, support a claim upon

which relief can be granted.  In deciding a 12(b)(6) motion, the court must accept as true all

factual allegations in the complaint and give the pleader the benefit of all reasonable

inferences that can fairly be drawn therefrom, and view them in the light most favorable to

the plaintiff.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).

"A court should not dismiss a complaint under Rule 12(b)(6) for failure to state a claim for

relief 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of

his claims which would entitle him to relief.'"  Pryor v. National Collegiate Athletic Ass'n,

288 F.3d 548, 559 (3d Cir. 2002) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

## IV.    Discussion

Lexington argues that Plaintiffs fail to state a claim upon which relief may be granted

because the facts set forth establish that Lexington had no duty under the policy to defend the

NAACP suit.  Lexington contends that neither Coverage A, B, nor the Hotel and Professional

Liability Services Endorsement covers the NAACP complaint, and even if one did, the

intentional discrimination exclusion applies.  For the following reasons, we find Lexington

5

had a duty, and will deny the instant Motion.

An insurer has a duty to defend a cause of action if any one claim included therein is potentially covered under the policy.  <u>Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.</u>, 193 F.3d 742, 746 (3d Cir. 1999).  The insurer has the burden of proving the applicability of an exception.  <u>Continental Cas. v. County of Chester</u>, 244 F. Supp. 2d 403, 407 (E.D. Pa. 2003) (citing <u>Mistrick, Inc. v. Northwestern Cas. Co.</u>, 806 A.2d 39, 42 (Pa. Super. Ct. 2002)).

The purpose of interpreting an insurance contract is "to ascertain the intent of the parties as manifested by the language of the written instrument."  <u>Standard Venetian Blind Co., v. American Empire Insurance Co.</u>, 469 A.2d 563, 305 (Pa. 1983).  Where the language of the contract is unambiguous, we are "required to give effect to that language."  <u>Id.</u>  In determining the plain meaning of the language, we must consider the whole policy.  <u>Frog, Switch</u>, 193 F.3d at 746.  If, however, the term in question is ambiguous, we must construe it "in favor of the insured because the insurer writes the contract."  <u>Id.</u>  However, "a provision is ambiguous only if reasonable people could, in the context of the entire policy, fairly ascribe differing meanings to it."  <u>Id.</u>

We find that the professional liability endorsement covers the NAACP complaint, the exclusion does not bar coverage, and therefore, Lexington had a duty to defend the NAACP suit.

6

**A.      Hotel and Professional Services Endorsement**

> The Company will pay on behalf of the Insured all sums which the
> Insured shall become legally obligated to pay because of:
>> Injury arising out of the rendering of or failure to render, during the
>> policy period, professional services by the Insured, or by any person
>> for whose acts or omissions such Insured is legally responsible.
>
> Exclusion
> 1.      This insurance shall not apply to any acts and omissions,
>         malpractice, or mistake of a professional nature committed or alleged
>         to have been committed by or on behalf of the Insured other than in
>         the conduct of the business activities as hotel proprietor.
>
> 2.      This insurance does not apply to liability to the Insured as a
>         proprietor, superintendent or executive officer of any hospital,
>         sanitarium, clinic with bed and board facilities, laboratory or
>         business enterprise.

(Compl. Ex. F).

Lexington contends that the underlying complaint does not allege an injury arising

from the rendering of professional services because the injury did not arise from any activity

that requires specialized training.   See Vising Nurse v. St. Paul Fire & Marine Ins. Co., 65

F.3d 1097, 1100 (3d Cir. 1995) (defining a professional service as one that requires

specialized training).  We disagree, and find that the underlying complaint alleges an injury

arising from professional services.  In Visiting Nurse, the insurer issued a policy to the

plaintiff nurse referral company that "provides protection against professional liability claims

which might be brought against [the plaintiff] in [its] professional practice." Id. at 1100.

The policy further defined the insureds as "home care providers." Id.  The underlying

complaint alleged various antitrust and racketeering violations, based on the plaintiff's

scheme to steer customers from hospitals to its home care service. Id. at 1099.   The court

found the underlying complaint did not allege a claim based on the plaintiff's professional practice.  A professional services is "one arising out of a vocation, a calling, occupation, or employment involving specialized knowledge, labor, or skill."  Id. at 1101 (quoting Harad v. Aetna Casualty & Surety Co., 839 F.2d 979, 983 (3d Cir. 1988)).   It found that the underlying complaint was not covered because it alleged injuries that arose from the plaintiff's "effort to operate its business, not from any professional service that were or should have been provided by discharge planners."  Id. at 1102.

The purpose of defining a 'professional service' by the necessary specialized skills or knowledge is to distinguish the professional aspect of an occupation from the general business aspect and from other occupations.  See Medical Record Assoc., Inc. v. American Empire Surplus Lines, 142 F.3d 512, 515 (1st Cir. 1988) (explaining that "professional services . . . embrace those activities that distinguish a particular occupation from other occupations, as evidenced by the need for specialized learning or training - and from the ordinary activities of life and business.").  Visiting Nurse specifically reasoned that the underlying complaint did not allege an injury arising from a professional services because the allegations "could be made against any business competing for referrals or customers."  Id. Similarly, Harad distinguished whether the underlying complaint alleged an injury arising from the plaintiff's unique services or from his general business operations.  839 F.2d at 984-85.  The plaintiff, who was an attorney, sought coverage under a professional services policy for a claim alleging malicious prosecution.  Id. at 980-81.  The defendant insurer argued that

this claim was not based on professional services because it did not arise out of the plaintiff's

activities with his own clients.  Id. 983.  The court rejected this argument because it found the

allegations were based on the attorney's specialized skill.  Id. at 983-84.  It explained:

> [T]he practice of law, as other similarly regulated professional activity
> in today's world, has two very different and often overlooked
> components - the professional and the commercial.  Given the dual
> nature of the practice of law, an attorney's liability for an action should
> be assessed depending on the particular role he was performing at the
> time the alleged liability arose.  For example, if an attorney, while
> hosting a real estate closing in his office, places his briefcase on the
> floor and a colleague trips on it, is injured, and sues him, the lawyer's
> liability would derive not from the rendering of a professional service,
> but rather from his operation of a business.  Conversely, since Harad's
> conduct in this case was not related to his operation of a business, but
> was derived solely from his providing legal services to a client, his
> liability is professional in nature.

Id. at 985.

The type of occupation in question affects the scope of the professional services

because different occupations have different services.  See Biborosch v. TransAmerica Ins.

Co., 603 A.2d 1050, 1055 (Pa. Super. Ct. 1992).  Biborosch found that acts such as

terminating contracts and soliciting agents were covered professional services for the insured

general manager, but recognized that they would not necessarily qualify as professional

services for other businesses, such as a law firm.  Id.  "[N]either Harad nor any of the other

similar cases . . . construe policies that insure against liability arising out of the performance

of the profession of general manager of a business."  Id.

The occupation presently in question is hotel proprietor.  Thus, the issue is whether

the injuries alleged in the underlying complaint arise out of the rendering of those services

unique to a hotel proprietor as opposed to business in general.  The injuries alleged arise

from the Yachtsman's discriminatory and oppressive rates, rules, and regulations.

(Underlying Compl. ¶ 3).   The primary source of the oppressive rules is the guest contract,

which the Yachtsman required as a condition for guest accommodations.  (Underlying

Compl. ¶ 36).  This contract imposed terms and conditions of the overnight stay, including

parking restrictions, requiring guest identification cards, limiting the number of unregistered

guests, limiting the visiting hours for unregistered guests, restricting the availability of

refunds, restricting the content and volume of speech in the hotel, and specifying the method

of payment.  (Underlying Compl. ¶ 36).  Thus, the NAACP complaint does not merely allege

an injury that could arise from any business, as did the underlying complaint in <u>Visiting

Nurse</u>.  Rather, it alleges that the injury arose from the hotel's discrimination in rendering

guest accommodations, an injury that could only be caused by the rendering of a hotel's

professional services, and is therefore covered by the professional services endorsement.

### B.     The Exclusion

The intentional discrimination exclusion provides, "It is understood and agreed that

this policy shall not apply to . . . discrimination committed intentionally against any other

person." (Def. Ex. B3 in Supp. Mot. to Dismiss).   The parties agree that this exclusion

applies solely to claims of intentional discrimination, but disagree as to whether the NAACP

complaint advances unintentional discrimination claims.

The underlying complaint is replete with allegations of that the Yachtsman

intentionally discriminated against the participants of Black Bike Week.  For example, "The

Yachtsman created and maintained . . . policies and practices that were intended to

discourage or prevent the plaintiffs . . . from contracting for goods."  (Underlying Compl. ¶

86).  "The discriminatory polices and practices of the Yachtsman were developed, adopted,

and maintained because of racial animus toward the predominantly black visitors during

Black Week."  (Underlying Compl. ¶ 87).  These policies, however, were not carried out by

every insured, but were carried out by the Shawnee's and General Direct's agents in the

scope of their regular authority as agents and employees of the Yachtsman.

> Upon information and belief, the discriminatory policies and practices of
> the Yachtsman have been carried out under the direction, and with the full
> knowledge and consent, of the highest officials of defendants Shawnee
> Development Inc and General Direct Marketing Inc.. . . . The agents and
> employees who have carried out the discriminatory policies and practices
> have been acting within the scope of their regular authority as agents and
> employees of the Yachtsman.

(Underlying Compl. ¶ 90).

The underlying complaint also alleges, "Defendants acts, including those through its

agents, as described herein, did, or were attempts, to withhold, deny, or deprive Plaintiffs of

their rights to full and equal enjoyment of the . . .accommodations."  (Id. at 108).  Thus,

because the underlying complaint seeks to impute liability upon some of the defendants for

the acts of their agents in the scope of their regular authority, rather than their own

discriminatory acts, it sets forth a claim for vicarious liability.

The NAACP's vicarious liability claims pursuant to 42 U.S.C. § 1981 and S.C. Code

Ann. 45-0-10, 45-9-30,  do not require proof of intent to discriminate by the vicariously liable

insured.  In <u>Bains v. Arco</u>, 405 F.3d 764, 773-74 (9th Cir. 2005), the court found the

defendant company vicariously liable under § 1981 for the intentional discrimination of its

agent even without proof that the company intentionally discriminated.  In describing the

agency limitations on vicarious liability, the court found:

> If a company official with sufficient authority to subject the company to
> vicarious liability backs-up a racist employee's racially motivated conduct
> instead of protecting the victim from the employee, then the company is liable,
> even if the supervisor's motivation is non-racial, such as loyalty to his
> subordinate or a desire to avoid conflict within the company.

<u>Id.</u> at 774.

Similarly, <u>Cabrera v. Jakobovitz</u>, 24 F.3d 372, 385-89 (2d Cir. 1994) found the

defendant landlords vicariously liable under §1981 for the intentional discrimination of their

rental agents even though the landlords did not intentionally discriminate because "a

principal is often subject to liability for the unauthorized conduct of an agent with respect to

matters which, under the agreement creating the relation, he has a right to direct."  <u>Id.</u> at 389

(quoting RESTATEMENT (SECOND) OF AGENCY § 216 cmt. A (1958)); <u>see also</u> <u>Eddy v. Waffle</u>

<u>House, Inc.</u>, 335 F. Supp. 2d 693, 700-02 (D.S.C. 2004) (finding that respondeat superior

liability is available under § 1981 and S.C. CODE ANN. §§ 45-9-10, 45-9-30).

Thus, the NAACP complaint included vicarious liability claims against Shawnee and

General Direct that do not require proof of their intentional discrimination.  The exclusion

states solely that "this policy shall not apply to . . . discrimination committed intentionally."

Thus, construing the exclusion narrowly, <u>Westport Ins. Corp. v. Bayer</u>, 284 F.3d 489, 498 n.7

(3d Cir. 2002), and resolving all ambiguity in favor of coverage, we hold that the exclusion

does not apply to the vicarious liability claims.[3]

Thus, we find that the Plaintiffs have stated sufficient facts to allow the Court to find that Lexington had a duty to defend the underlying suit because the professional services endorsement provides coverage and the intentional discrimination exclusion does not apply to the entire underlying complaint.  Accordingly, we will deny the motion to dismiss.  An appropriate order follows.

---

[3] We will not interpret the exclusion to apply to vicarious liability for intentional discrimination.  First, such an interpretation would expand the plain language and violate the rule requiring courts to interpret exclusions narrowly.  Second, although this matter appears to be a matter of first impression in Pennsylvania, we are persuaded by the various other courts that have reached the same conclusion.  See Northland Cas. Co. v. HBE Corp, 160 F. Supp. 2d 1348, 1362 n.10  (M.D. Fla. 2001) (noting that an intentional act exclusion does not apply to "claims of unintentional discrimination, such as disparate impact, negligent retention and hiring, and vicarious liability claims"); Covenant Ins. Co. v. Sloat, No. 385786, 2003 WL 21299384, at * 10 (Conn. Super. Ct. May 23, 2003) (finding that an exclusion for intentional acts did not apply to insured parents' vicarious liability for the torts of their son); Schmidt v. Smith, 684 A.2d 66, 582-83 (N.J. Super. Ct. 1996) (holding that a discrimination exclusion did not apply to claim for vicarious liability for discrimination).  Third, as the drafter of the exclusion, Lexington could have easily clarified that the exclusion applied to injuries arising from the intentional discrimination of the insured and individuals for whom the insured may be legally responsible.  Indeed, the Hotel and Professional Services Endorsement specifically included coverage for vicarious liability, and the exclusion could have just as easily specifically excluded it.

13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GENERAL DIRECT MARKETING, INC., | : | No. 3:05cv140 |
| SHAWNEE RESORTS OF SOUTH | : | |
| CAROLINA, INC., SHAWNEE | : | (Judge Munley) |
| DEVELOPMENT, INC., | : | |
| Plaintiffs | : | |
| v. | : | |
| | : | |
| LEXINGTON INSURANCE CO., | : | |
| Defendant | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>ORDER</u>

**AND NOW**, to wit, this 19th day of January 2006, Defendant Lexington Insurance

Company's Motion to Dismiss (Doc. 8) is hereby **DENIED**.

BY THE COURT:

s/ James M. Munley_____
JUDGE JAMES M. MUNLEY
United States District Court

14